**SARGENT BARGE LINE, Inc., v. DAVIS, Director General of Railroads, et al.**

(District Court, S. D. New York. January 21, 1924.)

**1. Wharves ⊛⟹20(3).**

Dredging company, performing work alongside of pier in accordance with contract, *held* not liable for damages to barge, punctured by spile carried into dredge area by shifting of mud.

**2. Wharves ⊛⟹20(3)—Railroad, maintaining pier and shifting barge to position alongside, held liable for damages to barge, punctured and caused to sink by spile carried into previously dredged area by shifting mud.**

Railroad, maintaining pier and with its tug shifting barge to position alongside pier, *held* liable for damages to barge, caused to sink by spile, which punctured its bottom after being carried into previously dredged area by shifting mud.

In Admiralty. Libel by the Sargent Barge Line, Inc., against James C. Davis, as Director General of Railroads (Pennsylvania Railroad Company), which impleaded the New Jersey Shipbuilding & Dredging Company. Decree for libelant against Director General only.

Decree affirmed 12 F.(2d) 787.

Park, Mattison & Lynch, of New York City (Anthony V. Lynch, Jr., of New York City, of counsel), for libelant.

Burlingham, Veeder, Masten & Fearey, of New York City (William J. Dean, of New York City, of counsel), for respondent Director General.

Alexander & Ash, of New York City (Peter Alexander, of New York City, of counsel), for impleaded respondent.

GODDARD, District Judge. [1, 2] This action was brought to recover damages sustained by the libelant, the owner of the barge Kenneth W. McNeill, which sank at the mooring rack of the Pennsylvania Railroad Company at South Amboy, N. J., during the night of March 1, 1919.

Between 10 and 11 p. m. on March 1, 1919, the libelant's barge McNeill, loaded with 1,200 tons of coal, was shifted by a Pennsylvania Railroad Company tug from

dumper No. 1, south side of Pier B across the slip, and placed in a berth on the south side of Pier A, outer end, with her starboard side toward the pier. When the barge reached Pier A, her captain noticed a sign forbidding boats to tie up there. Upon seeing this sign, the master of the McNeill protested to the captain of the Pennsylvania tug, and was told it was a safe berth, and that he had orders to place the barge there. The captain of the McNeill refused to make fast his line, so the master of the tug directed his deckhand, who was on the McNeill, to do it, which he did. The tug pushed the stern of the McNeill in toward the dock, and the captain of the McNeill made the stern line fast, so that the stern of the barge would not swing out and possibly be damaged by other vessels moving about. The captain then slacked off the lines for the tide, so that the barge would "sway away" from the pier about 6 feet.

During the early morning of March 2d, the captain of the barge was awakened and found about a foot of water in the cabin and all of the barge submerged, except the starboard stern corner. He and his family climbed through the window and then, by taking hold of the mooring line, all got out onto the pier.

On March 3d, Capt. Timmins, on the libelant's behalf, visited the pier to see about raising the sunken barge, and found her stern starboard corner about 6 feet off the pier and about eight feet from the outer end of the pier. After some delay, wrecking operations were commenced by removing the coal from the barge with a clamshell digger. During this operation the digger brought up through the stern hatch a spile 9½ inches in diameter at the top and 5 feet from end to end, with some slivers hanging down below; this spile had penetrated the bottom of the barge and also the ceiling.

McKenzie and Timmins, two witnesses, testified that the hole in the bottom through which the spile had protruded, was 13 feet from the starboard side; that there was a corresponding hole in the ceiling directly overhead. However, the Director General, in his verified answer to an interrogatory as to the exact location of the hole in the bottom of the barge, replied as follows: "Five feet from her starboard side. The petitioner has no knowledge as to how close to the side of the barge marks or scarrings from the pile extended. Two surveys of the damage were held and a copy of each is hereto annexed."

On October 2, 1918, the New Jersey Shipbuilding & Dredging Company, referred

12 F.(2d)—50

to hereinafter as the dredging company, entered into a contract with the Pennsylvania Railroad Company to dredge about 140,000 cubic yards of material in the coal piers at South Amboy. The contract provided that the company reserve the right to appoint an inspector or inspectors, and further their instructions should be obeyed. The dredging company dredged around several wharves and piers, including about a mooring rack, which was formerly the northerly side of a pier designated as Pier A. This Pier A formerly contained a trestle, used for elevating cars loaded with coal for convenience in discharging their contents into vessels lying at the wharf. In 1916 or 1917, the trestle had been dismantled, the floor of the dock removed, and such of the piles upon which the pier had been constructed as were visible were removed. This was the condition as existed there at the time the dredging company began its dredging.

At the time Pier A was dismantled, this northerly side was retained, put in condition with sheathing to make it safe, and was used by the company as a berth for barges, which were either waiting to be loaded with coal, or waiting to be towed away after they had received their cargoes. South of the line of piles, which constituted the north side of the rack, there was an irregular line of piles, which had formerly supported the dock.

To carry on the operation, the dredging company used a dredge 140 feet long by 45 feet beam, and operated a clamshell bucket, weighing about 10 tons. The bucket was closed with gears, and was strong enough to hold anything that got within its jaws. The dredge was under the immediate charge of a man of 25 years' experience in dredging. On the dredge, during the entire time, was an inspector appointed by the Director General according to the contract. The dredging company was paid a fixed rate per cubic yard. The area formerly covered by this old dock was laid out in ranges, the width of the dredge. These ranges being set up on the shore so that the dredge could always operate on a straight line. The dredging was commenced at the deep water beyond the end of the rack, and carried forward in stright cuts from that point up to the bulkhead. When one section was completed, this dredge was drawn out to deep water and placed on the next section, and so on.

The dredge was anchored and kept rigidly in position by three long spuds with steel caps, which were lowered down through spud wells in the hull of the dredge and made fast

to the bottom, so as to hold her rigidly in position and to prevent any motion. The bucket then dredged out a strip across her bow running into the next section, so that they would lap and prevent a ridge between the cuts. After this was done the bucket was closed, lowered down to the bottom, and swept across the space which had just been excavated, to ascertain if it were entirely cleared. If anything was encountered, it was dredged up, and, when the dipper showed that the space was cleared, then the crew of the dredge, under the direction of her master and observation of the inspector, swept the area with an apparatus called a sweep, that was provided for that purpose. This sweep consisted of a wooden pole which was attached in T-form to the middle of an iron bar 12 to 14 feet long, from each end of which a bridle line ran up to the pole, and so on to the dredge. This sweep was weighted in addition to the iron bar, so as to balance it in the water. The iron bar was then lowered at the bow of the dredge to the required depth, and the sweep drawn completely across the bow of the dredge. In this operation one-half of the iron bar would be under the dredge and one-half of it forward of the dredge.

While this sweeping was going on, the inspector also sounded the swept area as an additional precaution. After these sweeping operations had been completed, and no obstructions found, and, if found, removed, the dredge was moved forward about 7 feet (a distance equal to the width of the strip which had been dredged), the spuds lowered, and operation repeated. This was carried on until the whole area had been gone over and dredged. When the dredge had been moved forward, and a new strip excavated, and the operation of sweeping repeated, as half of the sweeping rod was under the dredge and half of it ahead of the dredge, the strip which had just previously been swept was covered again, so that the entire dredged area was swept twice. The inspector representing the Director General on the dredge admitted that he watched the sweeping and digging, and that it was done as well as it could be done. The contract provided that no dredging should be done nearer than 6 feet to the wharves, but along the south side of this Pier A, the piles, which were in the mud and did not reach down to the sand bottom, the inspector for the Director General directed that no dredging should be done within 7 feet, which was followed.

The Director General has impleaded the New Jersey Shipbuilding & Dredging Company under the Fifty-Sixth rule in admiralty, alleging that it is responsible for the damages to the barge, in that it failed to remove all submerged spiles from the berth where the McNeil was moored, and to make it a safe place for mooring barges.

In view of the careful sweeping of the excavated area, first by the dipper, and then by the sweep, which is confirmed by the respondent's inspector, who was on the dredge and present when these operations took place, I come to the conclusion that this spile, which punctured the bottom of the barge, was part of the old rack, which, in the interval of a month since the dredging had been done, had been shifted in there by the tide and action of the water, and it seems evident that if mud, such as this was, be excavated within 6 or 7 feet of the irregular lines of piles, without facing up the sides of the excavation to prevent it, the tide will cause the mud forming the support around the spiles to gradually shift forward toward the excavation, so that eventually the caving in of the mud sides and the washing of the adjacent bottom will form a sloping side, and as the surrounding mud moves it will carry with it the spiles imbedded in it. After the excavating had been done in this slip, there was some 17 feet of water in the part that had been excavated, and the mud bank in the vicinity of the piles was nearly awash. That such a shifting would generally be expected to follow appears from the testimony of the respondent, for later, to prevent this very thing, the sides of the excavation were faced up.

The respondent contends that, while there may have been some shifting of mud, and possibly of a spile, a spile could hardly have been shifted to such an extent that it would be in a position to puncture the bottom of a barge at a point 13 feet from its starboard side, which is the side nearest the rack. However, I do not believe, after hearing the testimony, that the puncture was 13 feet from the side. That, I think, was the mere guess of two witnesses four years after the occurrence. The respondent, in answer to libelant's interrogatories, stated that the hole in the bottom was 5 feet from her starboard side and that this statement, as to distance, was based upon actual surveys. Assuming the hole in the barge was 5 feet from the starboard side, it is apparent that the spile need only have shifted 4 or 5 feet for it to have made the hole.

The dredging company cannot be charged with the shifting of the mud and spiles of the old rack. They had excavated in accordance

with the terms of the contract, and their contract did not include the facing up of the sides of the excavated area. It was, however, the duty of the railroad company to exercise reasonable diligence and care in removing and keeping the slip clear of dangerous obstructions, and, when their representative ordered the barge captain to put his barge in the slip in the aforesaid manner, they made themselves liable for damages sustained by the barge because of their failure to use reasonable care in keeping it free from obstructions.

Accordingly a decree may be entered in favor of the libelant and against the respondent, James C. Davis, as Director General of Railroads, operating the Pennsylvania Railroad Company, with a reference to ascertain the damages sustained by the owner of the barge and the master of the barge, and dismissing the petition to implead the New Jersey Shipbuilding & Dredging Company.